Eugene B. GLICK and Marilyn K. Glick, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. IP 97–1431–C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

March 14, 2000.

Nestor Nicholas, Peabody & Brown, Boston, MA, Brian W Welch, McHale Cook & Welch, Indianapolis, IN, for Plaintiffs.

Kevin P Jenkins, Tax Division–U S Dept of Justice, Washington, DC, for U.S.

**ENTRY GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO COUNT I, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT I, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO COUNT II, AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO COUNT II**

BARKER, Chief Judge.

Plaintiffs, Eugene Glick and Marilyn Glick (collectively "Glicks") are currently in a complicated dispute with the Defendant, the United States of America, over the Glicks' tax liability for the years 1992 and 1993. At issue are two different tax deductions claimed by the Glicks relating to business investments for those years. After the Internal Revenue Service ("IRS") refused to allow these deductions,

the Glicks paid the disputed amounts. The Glicks now bring this action against the United States for the recovery of the income taxes which they allege were illegally and erroneously assessed and collected. For the reasons discussed below, the Court *GRANTS* the Glicks' motion for summary judgment on Count I, *DENIES* the United States' motion for summary judgment on Count I, *GRANTS* the United States' motion for summary judgment on Count II, and *DENIES* the Glicks' motion for summary judgment on Count II.

### I. Summary Judgment Standards.[1]

The legal standards for summary judgment are well established. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998).

The burden rests on the party moving for summary judgment to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106

S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505).

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

### II. Count I—The Passive Loss Issue.

#### A. Statement of Facts

As we discuss more fully below, the parties' dispute in Count I centers on how to interpret Title 26 U.S.C. § 469 of the Tax Code ("Code"), and the regulations promulgated thereunder by the Department of Treasury, specifically Treasury Regulation § 1.469–4. This code section and regulation section deal primarily with a tax shelter referred to as "passive loss." The parties have jointly stipulated to many of the facts made pertinent by these code sections, which thereby allows us to focus our analysis.

---

1. Although the traditional format is to place all of the relevant facts at the beginning of our entry and then proceed to the discussion, this case calls for a variation in that approach. The two counts contained within this complaint are factually unrelated, aside from the participation of the Glicks and IRS. For the sake of clarity, we deal with the two counts

independently. We first lay out the legal standard by which we evaluate both Counts I and II, and then proceed to Count I, identify the relevant facts, and discuss the legal issues related to those facts. After completing our analysis of Count I, we move on to identify Count II's relevant facts and discuss the legal issues related to those facts.

### 1. Background Facts.

During 1992 and 1993 the Glicks owned an equity and/or debt interest in 116 limited partnerships ("Partnerships"). *See* Pre–Summary Judgment Statement as to Passive Loss Issue, Joint Statement of Undisputed Material Facts ("Passive Loss Facts") ¶ 3. Each Partnership owned a specific apartment project. *See id.* The projects were located throughout the United States, but primarily in the Midwest, and were managed for a fee by the Gene B. Glick Company, Inc. ("GBG"), a Subchapter S corporation of which the Glicks owned 93.57% of the outstanding shares during 1992 and 1993. *See id.* ¶¶ 3, 4.

The Glicks' ownership interests in the Partnerships during 1992 and 1993 were reflected on both a "pre-flip" and a "post-flip" basis. *See id.* ¶ 5. The "pre-flip" percentage refers to the "ownership interest held by the Glicks in a particular partnership prior to the occurrence of a specified triggering event, such as the passage of time, the limited partners receiving from the Partnership cash distributions equaling their capital contribution, or the sale of the Partnership property (a 'Triggering Event')." *Id.* The "post-flip" percentage refers to the "ownership interest to be held by the Glicks in a particular partnership after the occurrence of a Triggering event." *Id.* As of the date of the Complaint in this action, seven of the 116 partnerships at issue had experienced a Triggering Event and as of the date the parties filed the Passive Loss Facts, twenty-six of the 116 partnerships had experienced a Triggering Event. *See id.*

During 1992 and 1993, of the original 116 partnerships, the Glicks owned a controlling general partnership interest in seventy-nine. *See id.* ¶ 6. The Glicks had sold a portion of their interest in thirty-three partnerships, receiving cash and notes; under the terms of these sales, the Glicks or their employees retained one percent of the interest as general partners and GBG continued to manage the properties that these partnerships owned. *See*

*id.* The Glicks had also sold their entire interest in three of the partnerships although GBG retained management responsibility for these partnerships' owned projects. *See id.* GBG also managed one partnership property in which the Glicks never held any ownership interest. *See id.*

The parties agree that it is proper to aggregate the activities of all 116 Partnerships under § 469. See *id.* ¶ 1.[2] The parties further agree that the activities of the Partnerships constitute "rental activities" and that any losses from these activities constitute "passive" losses under § 469. *See* United States' Memorandum in Support of its Motion for Summary Judgment as to Count I of Plaintiff's Complaint ("United States' Mem. Summ. J. Count I") at 8–9; Memorandum in Support of Plaintiffs' Motion for Summary Judgment as to Count I of Plaintiffs' Complaint and in Opposition to Defendants' Motion for Summary Judgment as to Count I of Plaintiffs' Complaint ("Pls.' Mem. Summ. J. Count I") at 11. The parties also agree that GBG qualifies as a trade or business, that the Glicks materially participated in GBG during 1992 and 1993 and that any income from these activities constitutes "non-passive" income. *See* United States' Mem. Summ. J. Count I at 9–10, Pls.' Mem. Summ. J. Count I at 11. The parties have also stipulated that the activities of the Partnerships and those of GBG form an "appropriate economic unit" under § 469, as defined in Treasury Regulation section 1.469–4(c). *See* Passive Loss Issue Facts ¶ 2.

### 2. GBG's Relationship to the Partnerships.

GBG was formed by the Glicks to manage the apartment projects owned by the Partnerships. *See id.* ¶ 13. In 1992 and 1993, GBG existed primarily to provide management services to the apartment projects owned by the Partnerships and provided little or no services to entities other than the Partnerships. *See id.* ¶ 14.

2. Section 469 and the regulations associated

with it, will be discussed in more detail *infra.*

GBG provided all of the services required by the Partnerships either by supplying them directly or by arranging for third party vendors to supply them. *See id.* ¶ 15. A majority of GBG's gross income in 1992 and 1993 was in the form of management fees paid to it by the Partnerships. *See id.* ¶ 19.

GBG and the Partnerships utilized a single accounting system that allowed receipt and disbursement entries to be posted on both of GBG's and the Partnerships' financial records simultaneously. *See id.* ¶ 16. Moreover, the day-to-day operations of the Partnerships were conducted by employees of GBG under Mr. Glick's daily supervision. *See id.* ¶ 7.

The overwhelming majority of the rental properties owned by the Partnerships were low-income housing projects developed and operated pursuant to HUD guidelines. *See id.* ¶ 13. In part, it was HUD that prompted the Partnerships to create GBG because it preferred that projects be managed by a separate management company. *See id.* Of course, HUD's preferences did not necessitate the formation of GBG; the Partnerships could have created individual management companies to manage each property.

The integrated status of GBG allowed the Partnerships to maintain lower costs. GBG utilized standardized procedures in managing all the properties, which controlled maintenance of the properties and prospective tenant applications. *See id.* ¶ 17. A standard lease and handbook were used for each property and the tenant(s). *See id.* Having a single management company allowed GBG to coordinate government compliance, documentation, data retention, contract formation, tax returns, property insurance, and marketing efforts. *See id.* All human resource issues were also handled by one entity instead of many different entities. *See id.*

Forming GBG also allowed Mr. Glick to take an active role in the Partnerships' rental operations. During 1992 and 1993, Mr. Glick established the policies and goals of each of the Partnerships. *See id.* ¶ 7.

Mr. Glick inspected each of the apartment projects owned by the Partnerships at least once each year. *See id.* GBG employees conducted the day-to-day activities of the Partnerships under Mr. Glick's daily supervision, and the operations of GBG were conducted by officers and other employees also under Mr. Glick's daily supervision. *See id.* ¶¶ 7, 8.

### 3. The Financial Condition of GBG and the Partnerships.

The gross income of the Partnerships was $111,300,571 in 1992 and $115,419,009 in 1993. *See id.* ¶ 8. The gross income of GBG was $12,581,134 in 1992 and $13,010,769 in 1993. *See id.* ¶ 19. The fair market value of the Partnerships was within a range of ten percent of $229,436,229 in 1992 and within a range of ten percent of $249,653,763 in 1993. *See id.* ¶ 10. The fair market value of GBG was between $5,664,209 and $6,412,312 in 1992 and was between $5,664,209 and $6,626,055 in 1993. *See id.* ¶ 21. The Glicks' portion of assets derived from GBG was between 4.78% and 9.29% of the overall assets that the Glicks derived from both GBG and the Partnerships in 1992 and between 4.63% and 8.68% in 1993. *See* Pls.' Mem. Summ. J. Count I at 31–32.

### 4. Damages Asserted by the Glicks Related to the Passive Loss Issue.

The IRS refused to allow the Glicks to claim the passive loss deduction for either 1992 or 1993. *See* Passive Loss Facts ¶ 23. Based upon this refusal, the IRS assessed a deficiency in income tax against the Glicks for both of those years. *See id.* ¶ 24. For calender year 1992, the IRS assessed a deficiency in income taxes related to the passive loss issue in the amount of $544,826 and interest of $222,280, for a total of $761,106. *See id.* ¶¶ 24, 27. For calender year 1993, the IRS assessed a deficiency in income taxes related to the passive loss issue in the amount of $804,963 and interest of $251,796, for a total of

$1,056,759. *See id.* The total assessed deficiency in income tax and interest attributable to the passive loss issue is therefore $1,823,865. *See id.* ¶ 24. The Glicks paid this amount to the IRS on May 21, 1997 and filed a claim for refund with the IRS for each of these periods and in these amounts (among other things). *See id.* ¶ 25, 26.

## B. Discussion

■ Count I of the Glicks' Complaint challenges IRS' treatment of the "passive loss" issue referenced above. After reviewing the parties' cross-motions for summary judgment on this issue, we conclude that the Glicks' claims are well-taken. For the reasons outlined below, the Glicks are entitled to prevail on their motion for summary judgment and the United States motion for summary judgment must be denied.[3]

### 1. Passive Loss Under the Tax Code and Federal Regulations

Since this issue ultimately calls for us to resolve a dispute over the proper interpretation of the Tax Code, we begin there. In the Tax Reform Act of 1986 ("Act"), Congress amended the Code to prohibit taxpayers from using losses from "passive" activities to offset income from non-passive activities. *See* 26 U.S.C. § 469(a). By statutory definition, "passive" activities include rental activities. § 469(c)(2). In contrast, non-rental, or "trade or business," activities are only passive if the taxpayer does not "materially participate" in the activity. § 469(c)(1). Therefore, under the general rule, § 469 allows a taxpayer to aggregate income from various passive activities together; however, the taxpayer may not use losses from "passive" activities, such as rental activities, to offset net income from trade or business activity in which he materially participates. *See* § 469(d).

The Act authorizes the Secretary of the Treasury to prescribe regulations as "necessary or appropriate to carry out the provisions of this section." § 469(*l*). As related to this case, the Secretary was to "specify what constitutes an activity ... for the purposes of this section." § 469(*l*)(1). Pursuant to this authority, Treasury Regulation section 1.469–4 defines "activity" and carves out a limited exception to the general prohibition on combining passive and non-passive revenue. *See* Treas. Reg. § 1.469–4.

Under this Treasury regulation, a taxpayer's activities are categorized in one of two ways: rental activities or "trade or business" activities. *See* Treas. Reg. § 1.469–4(b). For income tax purposes, these two categories of activities may be grouped together only if they pass a two-part test, *see id.:* First, they must form an "appropriate economic unit," which is determined by looking at all of the "facts and circumstances," with "the greatest weight" placed upon: "(i) Similarities and differences in types of trades or businesses; (ii) The extent of common control; (iii) The extent of common ownership; (iv) Geographic location; and (v) Interdependencies between or among the activities." Treas. Reg. § 1.469–4(c)(2). The second part of the two-part test requires that either "[t]he rental activity is insubstantial in relation to the trade or business activity ... [or that] the trade or business activity is insubstantial in relation to the rental activity ...." Treas. Reg. § 1.469–4(d)(1).

Considering the range of possible disputes that might arise in applying § 469's general rule and the Regulation's exception, the parties (thankfully) have succeeded in defining their dispute rather narrowly. The parties have stipulated that it is proper to aggregate the activities of all 116 partnerships under § 469. They further agree that the activities of the Partnerships constitute "rental activities" under

---

**3.** Neither party has cited any caselaw authority to support its position in Count I. Our independent review likewise has failed to un-cover any opinions interpreting the relevant Code sections.

§ 469 and that any losses from these activities constitute "passive" losses. The parties do not dispute that GBG qualifies as a trade or business, that the Glicks materially participated in GBG during 1992 and 1993, and that any income from these activities constitutes "non-passive" income. Thus, applying the general rule laid out in § 469, by virtue of the parties' agreements, the Glicks may not use the losses from the Partnership activities to offset the income from GBG. *See* § 469.

Furthermore, with respect to Regulation 1.469–4's exception, the parties have stipulated that the activities of the Partnerships and those of GBG form an "appropriate economic unit," as defined in 1.469–4(c). *See* Treas. Reg. § 1.469–4(c). Thus, the only remaining dispute concerns whether the activities of the Partnerships and GBG satisfy the second prong of Regulation 1.469–4(d)'s test that the activities of the Partnerships be "insubstantial" in relation to those of GBG or the activities of GBG be "insubstantial" in relation to those of the Partnerships. This determination requires us to resolve what is meant by the term "insubstantial."

### 2. Defining "Insubstantial."

Neither the regulations nor the Code defines "insubstantial." However, the legislative history does provide some indication of Congress' reasons for creating the passive loss rule and the significance of the grouping of activities. Our review indicates that Congress created the "passive loss" rule in 1986 to target syndicated and other such mass marketed tax shelters which had sprung up in recent years. *See* Report No. 99–313, Report of the Senate Finance Committee Accompanying Section 469 (1986) ("SFC Report") at 714; *see also* United States' Mem. Summ. J. Count I,

Ex. 4, Expert Report of Michael J. Grace ("Grace Report") at 2 (noting that the new rules specifically targeted these mass marketed tax shelters).[4] These shelters, prior to the enactment of the 1986 reforms, allowed individuals to offset their salaries, wages, or investment income with losses accrued from passive investments having no real relationship to how they had earned that income. *See* Grace Report at 12–13.

In Congress' view, the proliferation of these shelters had led to several significant negative results. *See* SFC Report at 713–14. Taxpayers were "losing faith in the Federal income tax system." *Id.* at 713. These shelters reduced Federal tax revenues and "divert[ed] investment capital from productive activities to those principally or exclusively serving tax avoidance goals." *Id.* at 714; *see also* Grace Report at 22–23 (stating that Congress wanted to limit the growing use of tax shelters because the system was perceived as unfair, the shelters were eroding the tax base, they were distorting the measurement of net income, and they were diverting capital from productive activities to activities principally or exclusively serving tax avoidance goals).

One course of action Congress considered and specifically rejected was the total elimination of all tax preferences under the Code. *See* SFC at 714–15. Rejection was premised primarily on the failure of that approach to account for the "many [tax] preferences that the committee believe[d] were] socially or economically beneficial." *Id.* at 715. Congress acknowledged that "[t]he question of what constitutes a tax shelter that should be subject to limitations is closely related to the question of who Congress intends to benefit when it

---

4. Grace participated in drafting Title V of the Tax Reform Act of 1986, including § 469, and its legislative history, and took the lead in drafting all of the regulations, rulings and legal guidance interpreting Title V that were issued by the Department of the Treasury and the IRS between 1986 and 1990. *See* Grace Report at 1–2. While this role does not enti-

tle Grace's opinion to be considered the equivalent of legislative history, it does add weight to Grace's perspective as to the purposes and other such considerations leading up to the Act's passage. We are thus inclined to accord enhanced weight to Grace's recorded recollections of the circumstances surrounding the enactment of the Act.

enacts tax preferences." *Id.* The Senate Finance Committee report continued, stating that

> in order for tax preferences to function as intended, *their benefit must be directed primarily to taxpayers with a substantial and bona fide involvement in the activities to which the preferences relate.* The committee also believes that it is appropriate to encourage nonparticipating investors to invest in particular activities, by permitting the use of preferences to reduce the rate of tax on income from those activities; *however, such investors should not be permitted to use tax benefits to shelter unrelated income.*

*Id.* at 716 (emphasis added). By describing the appropriate use of tax preferences, Congress sought to continue rewarding productive, economic activity. *See* Grace Report at 23. Congress clearly intended to tailor tax preferences to those situations where a taxpayer was substantially involved in the identified activities at the same time assuring that a taxpayer was not using the preferences to shelter income from unrelated activities.

Congress further addressed this concern in its discussion of how activities should be grouped in order to be entitled to this preference. "In applying the passive loss rule, one of the most important determinations that must be made is the scope of a particular activity." SFC Report at 739. Congress' stated goal was that "[t]he determination of what constitutes a separate activity ... be made in a *realistic economic sense.*" *Id.* (emphasis added). Congress insisted that such a definition not be determined simply by looking at the legal status of the entities involved; indeed, Congress said to "disregard" the legal status and examine the underlying activities involved. *Id.* at 740.

With this guidance, the Secretary of the Treasury promulgated Regulation section 1.469–4 defining an "activity." The only explicit reference to that term is found in the preamble to 26 C.F.R. Part I. *See* Limitation on Passive Activity Losses and Credits—Definition of Activity ("Def. of Activity"), 59 Fed.Reg. 50485, 50486 (1994). In response to the Secretary's proposed rule, many who commented requested clarification of the "insubstantial" requirement. *Id.*[5] The Secretary, however, refused to adopt a "bright-line or safe-harbor gross revenue test" and noted that "the term insubstantial refers to factors other than gross income." *Id.* The language in the preamble underscores the Secretary's directive that in determining whether the activities are insubstantial in relation to each other, we are to "look[ ] at all of the pertinent factors." *Id.*

### 3. GBG Activity in Relation to the Partnerships' Activity.

We move now to examine the facts and circumstances—"all of the pertinent factors"—both qualitative and quantitative, to obtain a realistic economic sense of the relationship between GBG and the Partnerships in 1992 and 1993.

### a. Qualitative factors

The parties agree that a correct examination requires us to look at more than the quantitative features of the two entities involved. A realistic economic assessment of the relationship between the Partnerships and GBG must also include qualitative features, such as the purpose of forming GBG initially and its role thereafter in relation to the Partnerships. In our judgment, a review of the relevant qualitative factors convincingly counsels that GBG and the Partnerships be viewed as a single activity, compelling us to view the role of

---

**5.** One issue raised in the comments related to the role that the temporary regulation's "80/20 rule" was to play in defining "insubstantial." *See* Treas. Reg. § 1.469–4T. The temporary regulation allowed a taxpayer to aggregate rental and nonrental operations into a single activity for the purposes of § 469 so long as more than eighty percent of the gross income was attributable to either of the two classes of operation. *See* Treas. Reg. § 1.469–4T(a)(3)(iv), 1.469–4T(d)(2).

GBG as insubstantial in relation to the Partnerships.

### i. GBG's role in relation to the Partnerships.

The stipulated evidence indicates that GBG and the Partnerships worked as an interrelated and integrated single business unit, rather than as two distinct entities who happened to provide services to each other. GBG was formed specifically to manage the apartment projects owned by the Partnerships. *See* Passive Loss Facts ¶ 13. In 1992 and 1993, GBG provided all of the services required by the Partnerships, supplying them either directly or by arranging for third party vendors to supply them. *See id.* ¶ 15. GBG existed almost entirely to provide management services to apartment projects owned by the Partnerships, providing little or no services during this time-frame to entities other than the Partnerships. *See id.* ¶ 14. This close operating relationship between GBG and the Partnerships indicates that they were two parts of a single economic enterprise.

In addition, GBG and the Partnerships were tied together on an operational basis, utilizing a single accounting system that allowed receipt and disbursement entries to be posted on both of GBG's and the Partnerships' financial records simultaneously. *See id.* ¶ 16. Moreover, the day-to-day operations of the Partnerships as well as GBG were conducted by employees of GBG, under Mr. Glick's daily supervision. *See id.* ¶ 7.

GBG clearly had no role beyond providing services for the Partnerships. It was subservient to and totally dependent upon the Partnerships for its revenue as well as its existence. Indeed, GBG had no income outside the management fees paid to it by the Partnerships, making the activities of GBG insubstantial in relation to those of the Partnerships.

Regarding the income generated by GBG, because almost all of GBG's gross income came from management fees paid to it by the Partnerships, had the Partner-ships managed the properties internally, instead of hiring the services out to GBG or a third party, these management fees would have been included in the income generated by the Partnerships. *See id.* ¶¶ 9, 19. With respect to the Glicks, the rental losses would have been characterized as passive losses under § 469, and the profits represented by the management fees would have also been characterized as passive income. *See* Treas. Reg. § 1.469–2T(c)(4)(i). The Glicks would have been entitled to offset their passive income and losses under the general rule of § 469. If we were to construe this income differently based purely on the fact that the management fees were passed to a different legal entity, we would derogate from the clear directive of Congress to "disregard" the legal status of the entities involved and examine the underlying activities. *See* SFC Report at 740.

### ii. The impetus for GBG's formation.

Our analysis requires us to consider more closely the purpose for forming GBG and the impact of GBG on the Glicks' role in the Partnerships' activities. We are of the view that the creation of GBG was not undertaken to generate additional income but rather to move income, generated by a single activity, from one legal entity to another. That additional income resulted from certain economies of scale does not change our view in this regard.

In part, GBG was formed to comply with HUD preferences. *See* Passive Loss Facts ¶ 13. The rental properties owned by the Partnerships were primarily low-income housing projects developed and operated under HUD guidelines. *See id.* HUD itself urged the creation of GBG because of its official preference that projects be managed by separate management companies. *See id.* Obviously, this alone did not require that the Partnerships form GBG to manage the properties; individual management companies could have been created to manage each individual apartment project. However, as we have out-

lined earlier, the integrated status of GBG allowed the Partnerships to maintain lower costs through standardized procedures in managing the properties. *See id.* ¶ 17. Uniform standards and procedures governed maintenance of the properties and prospective tenant applications. *See id.* Standard leases were used for each property and a uniform handbook was provided to tenants at each property. *See id.* As a single management company, GBG was able to coordinate government compliance, documentation, data retention, contract formation, tax returns, property insurance, and marketing efforts. *See id.* Human resource issues also were handled by one entity instead of many different entities. *See id.* Coordinating all of these activities no doubt allowed GBG to realize economies of scale that would have eluded individual management companies, but it also yielded other benefits as well.

It was not necessary that the Partnerships use GBG to provide these services; obviously, they could have been provided by another management company. However, by forming GBG to manage the properties, the Partnerships received the benefits of coordinated staffing and other functional integrations. GBG positioned Mr. Glick to take an active role in the Partnerships' rental operations, a role that § 469 was intended to encourage not discourage. During 1992 and 1993, Mr. Glick personally oversaw the formulation of policies and goals for each of the Partnerships. *See id.* ¶ 7. He inspected the apartment projects owned by the Partnerships at least once annually. *See id.* And GBG employees acting under his supervision conducted the day-to-day activities of the Partnerships as well as of GBG. *See id.* ¶¶ 7, 8.

These relationships depict two entities so substantially intertwined that to separate their income for tax purposes would unfairly deny them the benefits of § 469's limitations. Borrowing the words of Congress, we are persuaded that the Glicks had a "substantial and *bona fide* involvement" in the rental activities of the Partnerships, entitling them to use the passive

losses generated by the Partnerships to offset GBG income, and doing so would not create "tax benefits to shelter unrelated income." Our realistic economic sense, gained from this qualitative analysis, is that the Glicks are entitled to and should be allowed to apply the exception created by Regulation 1.469–4.

The United States responds with two separate arguments. First, the government maintains that the factors referenced above, in fact, support a conclusion that GBG was *not insubstantial* in relation to the Partnerships. Second, they contend that these facts are not relevant to the question of whether the entities are insubstantial in relation to each other, but rather to whether GBG and the Partnerships form an "appropriate economic unit." Since the parties have stipulated to that latter point, *see* Passive Loss Facts ¶ 2, the United States argues that the qualitative factors we have considered are irrelevant to the "not insubstantial" issue.

Although the United States argues that our conclusion is contrary to the language of the statute, *see* United States' Mem. Summ. J. Count I at 8, their argument seems to us to miss the point of the analysis. We have examined the intent behind the statute in order to reach a proper statutory interpretation. Allowing the Glicks to take this tax deduction does not implicate the concerns Congress was addressing when it passed the 1986 reforms. Rather, the activities engaged in by the Partnerships, GBG, and the Glicks were exactly the "socially or economically beneficial" activities that Congress in our view intended to exclude when it sought to limit, but not abolish, tax preferences.

While we agree that the factors we have included in our analysis are certainly relevant to the issue of whether the Partnerships and GBG form an "appropriate economic unit," that does not make them irrelevant to the question of whether the activities of GBG were insubstantial in relation to the activities of the Partnerships. If the same factors are relevant to both

parts of the Regulation's test in determining whether a given tax deduction should be allowed under the Code, they should be examined in both contexts.

The United States asks us to consider one, additional qualitative fact, contending that because GBG's activities were "*essential*" to the Partnerships' activities, GBG's activities were not *insubstantial* in relation to the Partnerships' activities. *See* United States' Mem. Summ. J. Count I at 12–15. Invoking Webster's definition of substantial, to wit, "'important, essential,'" the government argues that anything "insubstantial" is something "not important or essential." *See id.* at 16 n. 9. This definition, however, applied to the Tax laws to determine what business activities would be substantial eviscerates the Regulation's contemplated exception.

To make this point, the United States analogizes to the relationship between a computer chip and the computer. *See id.* at 24. Using Webster's definition of "substantial," the computer chip is "substantial" in relation to the computer, they say, because the computer would be unable to function without the chip and would be simply an "empty shell." *See id.* Plaintiffs' aptly respond that this analysis necessarily would characterize as "substantial" other undeniably insignificant parts of the computer such as the electrical plug or the power key because a computer also would be unable to function without these parts and would be an "empty shell" without them. *See* Pls.' Mem. Summ. J. Count

I at 15 n. 2. The government's analogy fizzles at this point.

One of the enumerated factors we are to consider in deciding whether an appropriate economic unit exists is the extent of interdependencies between the two activities. *See* Treas. Reg. § 1.469–4(c)(2)(v).[6] Clearly, the interdependencies between GBG and the Partnerships, the same interdependencies that led to the parties' stipulation that the entities formed an appropriate economic unit, resulted in GBG playing an "essential" role relative to the Partnerships. However, we have difficulty imagining a scenario where two activities are so interdependent that they form an appropriate economic unit, yet are not "essential" to each other in a way that the United States' definition would allow them to be considered "insubstantial." We thus conclude that GBG's "essential" role in the affairs of the Partnerships does not foreclose its being characterized as insubstantial in relation to the activity of the Partnerships.

### b. Quantitative factors[7]
### i. Gross Income

The first quantitative factor we consider is gross income. While the term "insubstantial" ordinarily refers to factors other than a simple comparison of gross incomes, *see* Def. of Activity, 59 Fed.Reg. 50485, 5486, the IRS itself considers Treasury Regulation section 1.469–4T's "80/20" gross income test to be "a good starting point" when deciding whether a rental ac-

---

6. We are assisted in our analysis by the parties' stipulation that GBG and the Partnerships constitute an appropriate economic unit. *See* Passive Loss Facts ¶ 2. We discuss it further here in order to more fully explicate the relationship between GBG and the Partnerships.

7. A recurring issue threading its way through the parties' submissions is whether we are obligated to assess the relevant quantitative factors at the business entity level or at the taxpayer level. The parties' stipulations provide a partial answer for us, having agreed that GBG and the Partnerships do, in fact, form an "appropriate economic unit." *See*

Passive Loss Facts ¶ 2; Treas. Reg. § 1.469–4(d)(1). We do not agree with the government's contention that utilizing an entity-level analysis would create a windfall for the Glicks since the passive loss they claim is only their share of the Partnerships' overall losses, and, in any event, the quantitative analysis is but one measure for determining the appropriateness of this deduction. Finding no logical or other persuasive basis to shift the analysis to the taxpayer level, we will rely on the parties' stipulation and proceed accordingly. Utilizing the business entity level, we will conduct a quantitative analysis to determine whether the activities of GBG or those of the Partnerships are insubstantial in relation to the other.

tivity is insubstantial in relation to trade or business activity, or vice versa. *See* IRS, Section 469—Passive Loss Limitations: Market Segment Specialization Program (MSSP) Guide on Passive Losses (April 27, 1994), 94 TAX NOTES TODAY 81–6, Doc. No. 94–4282, *available in* LEXIS, Tax–Federal Library, Tax Analysts Tax Notes Today File. Under Regulation section 1.469–4T's test, a taxpayer was permitted to group rental and trade or business activities so long as one of the components accounted for at least eighty percent of the total gross income of the combined activities and the other accounted for no more than twenty percent of the total gross income.

Applying the "80/20" rule and comparing the gross incomes of the two entities, it is clear that GBG's activity was "insubstantial" in relation to the Partnerships' activity.

Gross Income Comparison [8]

|  | 1992 | 1993 |
|---|---|---|
| Partnerships | $111,300,571 | $115,419,009 |
| GBG | $12,581,134 | $13,010,769 |
| Percentage of total gross income attributable to GBG [9] | 7.52% to 10.15% | 7.17% to 10.13% |

As the numbers in this table show, GBG accounted for only seven-to-ten percent of the total gross income of the combined activities of GBG and the Partnerships. These percentages are well below the twenty percent benchmark encompassed in the "80/20" test. By these measures, GBG must be viewed as insubstantial in relation to the Partnerships.

### ii. Fair Market Asset Value

The next quantitative factor involves a comparison between the percentage of the overall asset value attributable to the fair market value of GBG on the one hand, and the fair market value of the Partnerships on the other hand. As the Glicks point out, economists and analysts often use overall market valuation to compare widely divergent companies. *See* Pls.' Mem. Summ. J. Count I at 30–32.[10] Such a comparison reflects the comparative economic significance of the two activities.

In the case at bar, the relevant numbers are as follows:

Fair Market Value Comparison [11]

|  | 1992 | 1993 |
|---|---|---|
| Partnerships | within a range of 10% of $229,436,-229 | within a range of 10% of $249,-653,763 |
| GBG | between $5,664,-209 and $6,412,-312 | between $5,664,-209 and $6,626,-055 |
| Percentage of total asset value attributable to GBG | 2.24% to 3.10% | 2.06% to 2.95% |

8. The numbers in this table are derived from Passive Loss Facts paragraphs 18 and 19.

9. We state this conclusion using a range of numbers because the Glicks argue that GBG's gross income should not include the portion that represents the reimbursement of expenses related to Partnership activities. *See* Pls.' Mem. Summ. J. Count I at 26 & n. 9. This distinction does not effect our analysis since either way, the percentage of the overall gross income attributed to GBG is well below twenty percent.

10. One need only consider the criteria for such benchmark indices as the Standard & Poors 500, an index containing the 500 largest companies based upon market capitalization, and the Russell 2000, an index containing 2000 smaller companies based upon market capitalization, to find evidence that the market uses overall asset value as a primary organizational tool. The United States' opposition to our consideration of this factor stems from the distinction between real estate investments and trade or business investments. *See* United States' Mem. Summ. J. Count I at 23. Investments in real estate itself, by nature, is capital intensive while trade or business investments related to real estate are labor intensive. Therefore, the United States argues, it is impossible to compare the fair market values of the two entities when they represent such materially different investments. Again, the United States' position, if adopted, would make it practically impossible for a taxpayer to take advantage of the Regulation's exception to § 469. The purpose of Regulation section 1.469–4 is to allow certain combinations of real estate activities—which are capital intensive—with trade or business activities—which are labor intensive. Since the Regulation contemplates such a combination, it clearly contemplates such a comparison as well.

11. The numbers in this table are derived from the Passive Loss Facts paragraphs 10 and 22.

Examining the numbers in this table, it is clear that GBG accounted for only two-to-three percent of the total market value of the combined assets of GBG and the Partnerships. A comparison of these percentages substantiates our conclusion again that GBG accounted for an insubstantial portion of the overall market value of the combined activities.[12]

### c. Conclusion

As discussed above, in light of all the relevant facts and circumstances, we hold that the activity of GBG was insubstantial in relation to the activity of the Partnerships.[13] We thus conclude the Glicks' claim of the passive loss deduction for both 1992 and 1993 was proper. Accordingly, we *GRANT* the Glicks' motion for summary judgment on Count I and *DENY* the United States' motion on Count I.

### 4. Damages Related to Count I.

The IRS refused to allow the Glicks' claim of a passive loss deduction for either 1992 or 1993 and assessed a deficiency in income tax against the Glicks for both of those years. *See* Passive Loss Facts ¶¶ 23, 24. For calender year 1992, the assessed deficiency in income taxes relating to the passive loss issue was the amount of $544,826 plus interest of $222,280, for a total of $761,106. *See id.* ¶¶ 24, 27. For calender year 1993, the assessed deficiency in income taxes relating to the passive loss issue was the amount of $804,963 plus interest of $251,796, for a total of $1,056,759. *See id.* ¶¶ 24, 27. The total assessed deficiency in income tax including interest with respect to Count I therefore was $1,823,865. *See id.* ¶ 24.

The Glicks paid this amount to the IRS on May 21, 1997 and filed a claim for refund of these amounts, among other things. *See id.* ¶ 25, 26. Having found in favor of the Glicks with respect to Count I, we further hold that the United States illegally and erroneously assessed and collected $544,826 in income taxes, plus $222,280 in interest, for 1992 and $804,963 in income taxes, plus $251,796 in interest, for 1993. Therefore, the Glicks are entitled to

12. Even if we were to make this analysis at the taxpayer-level, we would conclude that the Glicks' portion of GBG assets was insubstantial in relation to the Glicks' portion of the overall assets. *See* Pls.' Mem. Summ. J. Count I at 31–32 (putting the Glicks' portion of GBG assets in a range of 4.78% and 9.29% of the overall assets allocated to the Glicks for 1992 and in a range of 4.63% and 8.68% for 1993).

13. The United States proposes that our analysis of quantitative factors also include the relative net income. *See* United States' Mem. Summ. J. Count I at 23. The Glicks argue that net income is not a relevant factor and support that contention in two ways. First, they claim that it is inappropriate because neither the temporary nor current regulations mentions net income as a relevant factor. *See* Pls.' Mem. Summ. J. Count I at 29. We accept the accuracy of their assertion that the regulations do not specifically mention net income; the regulations do, however, direct us to consider all the "pertinent factors" without elaborating on the meaning of that phrase. *See* Def. of Activity, 59 Fed.Reg. at 50486. Thus, we do not view the absence in the current regulations of any mention of net income as a compelling factor. The Glicks' second argument is that net income merely reflects tax preferences and credits and is not a "pure economic concept," comparable to gross income. *See* Pls.' Mem. Summ. J. Count I at 29–30. The Glicks' appear to be arguing that net income is not a "pertinent" factor. We do not find it necessary to resolve this philosophical dispute primarily because neither party has seen fit to provide the net income comparisons on an entity level. The United States does claim that, on a taxpayer basis, the Glicks' net income attributable to GBG is 45% of their total net income for 1992 and is 60% of their total income for 1993. *See* United States' Mem. Summ. J. Count I at 23. Although these net income figures from the taxpayer perspective do indicate a more substantial role for GBG, they do not change our final conclusion. We do not view our role as merely to place factors on a scale and see which come up higher; rather, we must attempt to obtain a "realistic economic sense" of the relationship between GBG and the Partnerships. Even in light of the United States' proffered net income figures, we nonetheless conclude that, overall, the quantitative factors demonstrate that the activity of GBG was insubstantial in relation to the activity of the Partnerships for 1992 and 1993.

a judgment in the amount of a repayment of $1,823,865, as damages on Count I.

### III. Count II—The CMO Issue.

The parties' dispute in Count II centers on the proper interpretation of other portions of the Code, specifically 26 U.S.C. §§ 860A–860G, as applied through 26 U.S.C. §§ 171, 1272, and 1273. These Code provisions deal with the taxation of interests in "mortgage-backed securities" known as "REMICs." For the reasons explicated below, we GRANT the United States motion for summary judgment and DENY the Glicks' motion for summary judgment as to Count II.

### A. Statement of Facts

### 1. Background Facts.

Mortgage-backed securities are available to investors through certain organizations, including the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). See Pre–Summary Judgment Statement, Joint Statement of Undisputed Material Facts ("CMO Facts") ¶ 3. Mortgage-backed security investments are ordinarily initiated when a financial institution assembles a pool of mortgages for the purpose of reselling interests in the mortgages on the secondary market. See id. The financial institution then transfers the pool of mortgages to an organization such as Fannie Mac which creates a trust or Real Estate Mortgage Investment Conduit ("REMIC") that holds the pool or cash. See id. Interests in the REMIC, called "tranches," are tailored to provide different options to investors with regard to maturity of the investment, credit risk, and prepayment risk. See id. These tranches are then marketed to investors who depend upon cash flow from the underlying mortgage pool rather than a more traditional debtor-creditor relationship. See

United States' Memorandum in Support of Its Motion for Summary Judgment as to Count II of Plaintiffs' Complaint and in Opposition to Plaintiffs' Motion for Summary Judgment as to Count II of the Complaint ("United States' Mem. Summ. J. Count II") at 2 n. 1.

### 2. The Glicks' Interests.

During 1992 and 1993, the Glicks owned 100% of the issued and outstanding shares of EBG Insurance ("EBG"), a corporation organized under Indiana law and taxed under Subchapter S of the Internal Revenue Code of 1986, 26 U.S.C. §§ 1361–1379. See CMO Facts ¶ 1. In addition, during the same two years, the Glicks directly owned 95% of the partnership interests in Mount Vernon Mortgage Company ("Mount Vernon") and indirectly owned the remaining 5%. See id. ¶ 2.

### 3. Mount Vernon's Purchase of the CMO.

On January 27, 1992, Mount Vernon purchased an interest in a mortgage-backed security known as "Class 160–PT Federal National Mortgage Association REMIC Trust 1991–160" (the "CMO") from Fannie Mae. CMO Facts ¶ 4.[14] Mount Vernon paid $12,360,730 for this CMO that comprised one of the tranches in the $1,632,000,000 Fannie Mae REMIC Trust 1991–160 and was anticipated to have a seven-year duration. See id. ¶¶ 4, 5. The CMO was an investment from the "IOette investment class," meaning that the anticipated cash flow from Mount Vernon's investment in the CMO was, with a minor exception, linked to the interest payments from the underlying mortgage pool. See id. ¶ 6. While most of the cash flow was linked to interest payments from the underlying mortgage pool, $362,000 of the cash flow was linked to principal payments received from the underlying mortgage pool. See id.

14. These interests are also referred to as a "collateralized mortgage obligation" leading the parties to refer to this investment through-

out their briefs as a CMO. See United States' Mem. Summ. J. Count II at 2.

Part of Mount Vernon's analysis in deciding whether to purchase the CMO was the anticipated prepayment time schedules of the mortgages underlying the mortgage pool ("PSA"). *See id.* ¶ 9. The PSA is a standard measure of mortgage prepayment created by the Public Securities Association; if no mortgages prepay, then PSA equals zero. *See* United States' Mem. Summ. J. Count II, Ex. 1, Mark J. Eppli, "The Economic Benefits and Risks of Investing in Mortgage–Backed Securities with an Emphasis on Class 160 PT of Fannie Mae REMIC Trust 1991–160" ("Eppli Report") at 3.[15] The CMO's purchase price was based on certain assumptions concerning the PSA, as well as the interest rates being paid on the underlying mortgage pool. *See* CMO Facts ¶ 7. At the time of Mount Vernon's purchase, the underlying mortgage pool was determined to have a prepayment rate of 154% PSA. *See* CMO Facts ¶ 7.

REMIC payouts are tied primarily either to the interest payments of the underlying mortgages, such as the CMO or an IO that is linked exclusively to interest payments (collectively "interest-based CMOs"), or to the principal payments of the underlying mortgages ("principal-based CMOs"). *See id.* ¶ 8. Interest-based CMOs and principal-based CMOs react inversely when prepayment rates of the underlying mortgages exceed anticipated rates. *See id.* Prepayment rates greater than expected have a *negative* effect on an *interest-based* CMO because the underlying mortgages, which control the measure of the payments, are being eliminated faster than expected. *See id.* That is, interest-based CMO's derive their value to the investor from the *future interest payments* to be made on the as yet unpaid mortgages. It is these future interest payments that serve as the principle determinant of both the yield on and recovery of the

investment. *See id.* ¶ 17. When the underlying mortgages are prepaid faster then expected, the future interest payments that the investor was to receive are themselves also eliminated, having never been received by the investor. *See id.* In contrast, prepayment rates greater than expected have a positive effect on principal-based CMOs because the investor receives payments much faster than anticipated. *See id.* ¶ 8.

A second factor which Mount Vernon considered at the time it purchased the CMO was its "anticipated yield to maturity." *Id.* ¶ 11. The "anticipated yield to maturity" is calculated using the CMO's purchase price and the anticipated payments Mount Vernon would receive on the CMO, based on its PSA and duration. *See id.* ¶ 10. The CMO had an expected lifetime cash flow of $14,350,615.24 at the time of Mount Vernon's purchase. *See id.* ¶ 12. Given Mount Vernon's purchase price of $12,260,730, the CMO's 154% PSA, and its seven-year duration, the parties stipulate that the anticipated yield to maturity was 7.92%. *See id.* ¶ 10. In addition, the Prospectus identified the original stated principal balance as $362,000 and the interest rate as 1006.69613%. *See id.* ¶ 13.

### 4. Economic Reality of the CMO Purchase

Both parties discuss the economic reality of the CMO purchase and attempt to characterize it in a manner consistent with their respective legal positions in Count II. *See* United States' Mem. Summ. J. Count II at 15–19; Plaintiffs' (i) Brief in Opposition to Defendants' Motion for Summary Judgment as to Count II of Plaintiffs' Complaint; and (ii) Reply in Support of Plaintiffs' Motion for Summary Judgment as to Count II of the Complaint ("Pls.' Reply Mem. Summ. J. Count II") at 3–7.

---

15. The parties have stipulated to the accuracy of most of the findings contained in the Eppli Report. *See* CMO Facts ¶ 30. The only statement to which the parties did not stipulate was Eppli's conclusion that "[t]he cashflows that were returned to the investor for Class 160 PT were only $7,434,467, which was $4,826,263 less than the investment purchase price of $12,260,730 resulting in a substantial investment loss." *Id.* (citing Eppli Report at 9).

Plaintiffs classify the transaction as very risky, *see* Pls.' Reply Mem. Summ. J. Count II at 3–7, while the United States classify it as relatively conservative, *see* United States' Mem. Summ. J. Count II at 15–19.

The Plaintiffs rely primarily on evidence already summarized, i.e. the $362,000 premium and the 1006% interest rate discussed in the Prospectus. Pls.' Reply Mem. Summ. J. Count II at 3–4. Plaintiffs argue that these characteristics led to the "market's understanding of the CMO . . . [as] purchased at a premium and not at a discount." *Id.* at 3.[16] Plaintiffs also cite the financial industry's definition of premium and discount as found in the Thorndike Encyclopedia of Banking and Financial Tables, although they claim the information stated in the Prospectus associated with the CMO, upon which they claim to have relied, is most important to our conclusion. *See id.* at 4 & n. 1.

Included with the CMO by Fannie Mae were both a prospectus, discussing in general terms the potential federal tax consequences of investing in any of the guaranteed REMIC pass-through certificates, and a supplemental prospectus that specifically discusses the consequences of REMIC Trust 1991–160 investments. *See* United States' Mem. Summ. J. Count II, Ex. 2 (respectively "Prospectus" and "Prospectus Supplement" or "Prospectus Supp."). Discussing REMIC certificates generally, Fannie Mae explained that some certificates would likely be treated by the IRS as having been issued with "original issue discount" ("OID") and some would likely be treated as having been purchased "at a premium." Prospectus at 17, 19. The way that IRS ultimately characterizes these interests carries implications concerning what section of the Code governs the tax consequences of owning the REMIC interests, specifically whether they would be treated under 26 U.S.C. § 171 (dealing with bonds purchased at a premium) or 26

U.S.C. § 1272 (dealing with debt instruments issued with OID). *See id.* at 17–19. With respect to the CMO, Fannie Mae stated its belief that it "will be" treated as having been purchased at a premium. *See* Prospectus Supp. at S–57—S–58.

In contrast, the United States opines that the CMO investment was a rather conservative one. The United States argues that to characterize the CMO as an investment having a $362,000 principal and paying an interest rate of 1006% would defy reality. Such a characterization would require us to conclude that a seller of an IO, i.e. an interest with no allocated principal, would be paying an infinite amount of interest for the use of absolutely no money because the purchaser would have no rights to payments at all. *See* United States' Mem. Summ. J. Count I. at 18. The United States relies in part upon Eppli's conclusion that the CMO was "[s]imilar to the investment in corporate bonds" and that "the investment in an interest only PAC mortgage-backed security [i.e. the CMO] was expected to return the investment purchase price of $12,260,-730 as well as an 8.47% annual yield." Eppli Report at 9.

Moreover, the United States argues that the Glicks and their representatives did not actually consider the CMO to be a high-risk investment. When looking for a way to invest the money that eventually went into the CMO, Tom Grande, the Mount Vernon representative in charge of determining its investment opportunities, told the broker that Mount Vernon "didn't want to take a significant amount of risk or any risk of principal. [Mount Vernon] had never invested in anything that had any kind of significant risk or any risk of principal. Most of the bonds that were purchased were high-quality bonds or bonds guaranteed by third parties . . . we weren't looking for a big spread." United States'

---

**16.** The terms "at a premium" and "at a discount" refer to concepts embodied in § 171, discussing bonds purchased at a premium, and §§ 1272 and 1273, discussing debt instruments purchased with "original issue discount" ("OID"). We discuss these code provisions in more detail *infra.*

Reply Memorandum in Further Support of Its Motion for Summary Judgment as to Count II of Plaintiffs' Complaint ("United States' Reply Mem. Count II"), Government Ex. 9, Deposition of Thomas Grande ("Grande Dep.") at 14–15. Consistent with this expectation, the United States references an inter-office memorandum, written by Grande a year after purchasing the CMO, in which Grande wrote that Mount Vernon had "purchased [the CMO] to yield 7.8% with an expected average life of 3.73 years." United States' Mem. Summ. J. Count II, Ex. 3, Interoffice Memo from Tom Grande to EBG re: Mount Vernon Mortgage Company FNMA Security, Feb. 12, 1993 ("Grande Memo."); *see also* United States' Mem. Summ. J. Count II, Ex. 5, Deposition of Anita Smith at 51, 80 (stating that at the time of the investment decision, Mount Vernon believed the CMO to be safe investment and expected close to an eight percent yield).

Finally, the United States cites the Prospectus and Prospectus Supplement to support their position that the CMO was viewed as a conservative investment. Of particular interest, the Prospectus explained that:

A purchaser of a Regular Certificate that purchases such a Certificate at a cost greater than its remaining stated redemption price at maturity will be considered to have purchased such Certificate (a 'Premium Certificate') at a premium.... [However,] [s]ome Regular Certificates may provide for only nominal distributions of principal in comparison to the distributions of interest thereon. It is possible that the IRS or the Treasury Department may issue guidance excluding such Certificates from the rules generally applicable to debt instruments issued at a premium. In particular, *it is possible that such a REMIC interest will be treated as having original issue discount equal to the excess of the total payments to be received thereon over its issue price. In such event, Section 1272(a)(6) of the Code would govern the accrual of such original issue discount ....*

Prospectus at 19 (emphasis added). As for the specific investment at issue in this case, Fannie Mae reiterated its belief that the CMO would be treated as having been purchased at a premium but that it "may be excluded from the rules generally applicable to debt instruments issued at a premium *because such REMIC Certificates provide for relatively small distributions of principal.*" Prospectus Supp. at S–57—S–58 (emphasis added).

### 5. Mount Vernon's Transfer of the CMO.

During 1992, 1993, and 1994, dramatic decreases in interest rates caused the prepayment rate of the mortgages underlying the CMO to increase well beyond the rate predicted at the time of Mount Vernon's purchase. *See id.* ¶ 16. The rate at which the underlying mortgage obligations were prepaid thus had a significant impact on the CMO payments received by the investor. *See id.* ¶ 17. As explained earlier, Mount Vernon's CMO was an "interest based" CMO and higher prepayment rates of the underlying mortgages had a negative effect on the CMO's value. *See supra;* CMO Facts ¶ 8. By 1993, it was determined that the CMO was no longer an appropriate investment for Mount Vernon. *See id.* ¶ 14. Mount Vernon subsequently transferred the CMO to the Glicks on July 15, 1993 although, for tax purposes, the transfer was treated by the Glicks as having been completed on January 1, 1993. *See id.* The Glicks then transferred the CMO to EBG on July 16, 1993, although, again for tax purposes, the transfer was treated as having been made on January 2, 1993. *See id.* ¶ 15.

According to the prospectus for the CMO, if the CMO obtained greater than a 396% PSA for as little as one month, while equaling 396% PSA for the remaining months, "the taxpayer would not fully recoup its initial investment." *Id.* ¶ 18 (citing Prospectus Supp. at S–46, S–47). During 1993, the PSA was at a low of 319% PSA in January and increased throughout

the year, reaching 794% PSA in October, 1993, 847% PSA in November, 1993, and 899% PSA in December, 1993. *See id.*

EBG received the final payments on the CMO, and it was retired, in 1994. *See id.* ¶ 24. During 1993 and 1994, the Glicks contend that there was a loss arising from the CMO valuing $5,452,179. *See id.* The United States argues, in contrast, that in 1994 EBG still had an unrecovered basis in the CMO, by reference to Mount Vernon's basis, of $5,452,179. *See id.*[17]

On the 1993 and 1994 tax returns filed by the Glicks, the tax basis of the CMO was amortized over the period of expected remaining payments based upon what EBG characterized as "a constant yield to maturity methodology." *See id.* ¶ 25. For the 1993 tax year, EBG calculated the constant yield to maturity based upon the cash actually received each month during the year with respect to the CMO and the anticipated cash to be received in 1994 based upon the 950% PSA provided by Bear Stearns on or about March 1, 1994.[18] Based upon the calculated constant yield to maturity, the actual and projected payments as of March 1, 1994, and the adjusted basis in the CMO at the beginning of 1993, EBG calculated the premium amortization, under § 171. *See id.* Utilizing this methodology, the Glicks—by virtue of a pass-through from EBG, an S–Corporation,—claimed an ordinary loss from the CMO of $5,476,028 in 1993 ("Ordinary Loss Deduction"),[19] and an ordinary loss of $8,531 from the CMO in 1994. *See id.*

The IRS disallowed the Ordinary Loss Deduction in calendar year 1993, claiming that the loss instead must be taken in calendar year 1994 as a capital loss under 26 U.S.C. §§ 1211 and 1271(a)(1). *See id.* ¶ 26. On April 21, 1997, the IRS assessed against the Glicks a deficiency in income taxes related to the CMO issue of $1,432,013 and interest of $447,940 and a total deficiency in income tax with respect to calendar year 1993 in the amount of $1,706,889, plus interest in the amount of $533,881.67. *See id.* ¶ 27.

The Glicks paid this amount on May 21, 1997, thereby paying all federal income taxes which the United States claims are due for the 1992 and 1993 calendar years. *See id.* ¶ 28. The Glicks, however, dispute the IRS' assessment and collection of income taxes attributable to the CMO issue for calendar year 1993 in the amount of $1,432,013 and interest in the amount of $447,940, for a total of $1,879,953. *See id.* ¶ 29.

### B. Discussion [20]

#### 1. Characterization of the Underlying Transaction

■ The heart of the parties' dispute in Count II arises over whether we should calculate the Glicks' tax obligation by looking at § 171's rules dealing with instruments purchased at a premium or at § 1272's rules dealing with instruments issued with OID. Before we can apply either Code section's rules, however, we must determine how to properly characterize

---

17. While neither party explains how this number was reached, our computations suggest that it comes by subtracting from the original purchase price for the CMO ($12,260,730) the amount of cash flows received by Mount Vernon and EBG during 1992 ($3,382,302), 1993 ($3,487,598), and 1994 ($696,448), totaling $7,566,348, less the amount of interest income reported by Mount Vernon and EBG on their tax returns (Mount Vernon reported $757,797 on its 1992 tax return). *See* CMO Facts ¶¶ 4, 20–21, 23.

18. EBG had already received the actual payments for the first two months of 1994 and

those numbers were used in the calculation. *See* CMO Facts ¶ 25.

19. This apparently was intended to account for the entire loss which the Glicks contend arose from the CMO, as the parties have stipulated that the proper amount utilizing the Glicks' methodology would have been $5,452,179. *See* CMO Facts ¶ 25.

20. As with Count I, the parties submissions with respect to Count II contain very few citations to cases supporting their positions. Once again, our independent review has uncovered no additional caselaw interpreting the issues now before us.

the underlying transaction: was it an investment that was purchased at a premium or one that was issued with OID? Resolving this question will take us a long way towards determining the final outcome, because § 1272's rules apply to debt instruments issued with OID, and explicitly exclude instruments purchased at a premium, while § 171's rules will apply only if the CMO is characterized as a bond purchased at a premium. *See* Pls.' Reply Mem. Summ. J. Count II at 2.[21] Examining the economic reality of the transaction, we conclude that CMO is most appropriately characterized as an interest that was issued with OID, as defined by Code § 1273(a), and not as a debt instrument that was purchased at a premium, which would have made § 171 applicable.

As both parties concede, the actual economic reality of the transaction informs our decision on the applicable law. In fact, Plaintiffs contend that the "only 'economic reality' that should matter here is the economic reality stated in the Prospectus on which reliance was placed at the time of the investment." Pls.' Reply Mem. Summ. J. Count II at 4 n. 1. While the Prospectus and Prospectus Supplement are not binding legal authority in determining how we should treat these investments, they do influence the resolution of the issue by indicating what information a reasonable investor would have had at her disposal, as well as the information that Mount Vernon actually had, upon investing in the CMO. In examining the Prospectus and the Prospectus Supplement, and considering the apparent expectations of Mount Vernon upon investing in the CMO as well as the market's understanding of the CMO, we conclude that the CMO was a debt instrument valued at approximately $14,000,000,

purchased at a discount of approximately $2,000,000, and yielding approximately 8% interest, rather than an instrument of a value of $362,000, purchased at nearly a $12,000,000 premium, yielding over 1000% interest.

Considered alone, the Prospectus and Supplement are inconclusive. Plaintiffs accurately state that the Supplement claims that the CMO "will be" treated as purchased at a premium. *See* Prospectus Supp. at S–57—S–58. However, this conclusion is tempered by the Supplement's cautionary words that the IRS may take the very position that it has taken in this case, concluding that the CMO be "excluded from the rules generally applicable to debt instruments issued at a premium because such REMIC Certificates provide for relatively small distributions of principal." *Id.* at S–58. The Prospectus reiterates this cautionary admonition, concluding that those REMIC certificates such as the CMO that have "only nominal distributions of principal in comparison to the distributions of interest thereon" may be treated as issued at a discount instead of at a premium. Prospectus at 19. Taken together, these statements made it unreasonable to place any reliance on the Supplement's "assurance" that the CMO will be treated as having been purchased at a premium. To the contrary, we conclude that a reasonable investor, upon reviewing these apparently conflicting, or at least confusing, statements would have attempted to obtain a definitive position from other sources.

Moreover, the evidence clearly indicates that Plaintiffs did not actually rely on the Supplement's isolated comment, nor did they believe at the time that the invest-

---

**21.** The Glicks provide the clearest distillation of the issue in Count II:

[T]he fundamental issue in this case is whether the CMO is a $362,000 debt instrument, purchased at a nearly $12,000,000 premium and yielding over 1000% interest (in which case Section 171 would apply), or an approximately $14,000,000 debt instrument, purchased with original issue discount ("OID") of approximately $2,000,-

000, with an interest rate of less than 8% (in which case Section 1272 would apply). If the CMO was purchased at a premium and Section 171 of the Code applies, the Glicks are clearly entitled to summary judgment. If the instrument was purchased with OID and Section 1272 applies, Defendant is entitled to summary judgment.

Pls.' Reply Mem. Summ. J. Count II at 2.

ment was one involving the high levels of risk that would have been inherent if the CMO were being purchased at nearly a $12,000,000 premium.[22] Tom Grande, Plaintiffs' representative in charge of identifying Mount Vernon's potential investment vehicles, was, by his own admissions, looking for a conservative investment when he learned of the CMO. *See* Grande Dep. at 14. Mount Vernon "didn't want to take a significant amount of risk" with the money it was investing in the CMO. *Id.* Grande testified that Mount Vernon "had never invested in anything that had any kind of significant risk or any risk of principal. Most of the bonds that were purchased were high-quality bonds or bonds guaranteed by third parties . . . we weren't looking for a big spread." Grande Dep. at 14–15. Moreover, he testified that the investment fund manager used by Mount Vernon to determine appropriate bond investments "knew the amount of risk that [Mount Vernon] would take." *Id.* at 14. These comments all compel the conclusion that, at the time Mount Vernon purchased the CMO, Mount Vernon considered it to be a conservative investment, not a highly risky investment.

Even after maintaining the CMO investment for over a year, Grande still believed that the CMO was a relatively conservative investment. *See* Grande Memo. In describing the CMO to EBG, Grande said that Mount Vernon had purchased it "to yield 7.8% with an expected average life of 3.73 years," reinforcing our conclusion that the Plaintiffs themselves viewed the CMO as one involving little risk with a yield of approximately 8% interest, not one involving high levels of risk with a yield of over 1000% interest. *Id.*

The evidence further suggests that the market also considered the CMO to be a conservative investment bearing a relatively low interest rate rather than a highly

risky investment bearing a quadruple-digit interest rate. The parties have jointly stipulated to the statements made by Mark Eppli. *See* CMO Facts ¶ 30. One of Eppli's assertions was that "[s]imilar to the investment in corporate bonds, the investment in an interest only PAC mortgage-backed security [i.e. the CMO] was expected to return the investment purchase price of $12,260,730 as well as an 8.47% yield." Eppli Report at 9. The Glicks do not contest this conclusion. *See* CMO Facts ¶ 30 (stipulating to the entire report except for a single sentence and statements contained in Table 3). Even if they did contest Eppli's conclusion, Grande's comments indicate that, at the time of the transaction, Mount Vernon agreed with Eppli's assessment. *See* Grande Dep. at 14–15; *see also* United States' Mem. Summ. J. Count II, Ex. 5, Deposition of Anita Smith at 51, 80 (stating that at the time of the investment decision, Mount Vernon believed the CMO to be safe investment and expected close to an eight percent yield).

We, too, accept Eppli's conclusions as evidence of the markets' view of the CMO, and shared by Mount Vernon, that the CMO was a relatively conservative investment, not a highly risky one. Accordingly, we hold that the CMO was intended to be a debt instrument bearing approximately 8% interest, not a debt instrument valued at $362,000 and bearing 1000% interest. *Cf.* United States' Mem. Summ. J. Count II at 18 (noting that the total expected return of the CMO bears no relationship to the $362,000 principal component of the CMO and that the Glicks argument would lead to the conclusion that the seller of an IO investment, with a stated principal of zero, would be paying an infinite amount of interest for the use of absolutely no money). Stated otherwise, we reject the

---

**22.** If we were to construe the CMO to be valued at $362,000 and purchased at a premium of nearly $12,000,000, this would mean that the only amount guaranteed to Mount Vernon was $362,000 and that the additional $12,000,000 was put entirely at risk. *See*

United States' Mem. Summ. J. Count II at 17–20; Pls.' Reply Mem. Summ. J. Count II at 6. We do not believe prudent investors such as the Glicks would have been attracted to such an investment.

Glicks' contention that the CMO was an instrument issued at an extremely high premium relative to the $362,000 "principal" and that § 171 should be applied to determine the Glicks' tax obligation on the CMO.

If Section 171 were to apply, it would allow the taxpayer to deduct the "the amount of the amortizable bond premium for the taxable year." 26 U.S.C. § 171(a)(1). Section 171 defines a "bond" to be "any bond, indenture, note, or certificate or other evidence of indebtedness ...." § 171(d). The amortizable bond premium is the difference between the taxpayer's basis in the bond and the amount payable on maturity of the bond, or a specified call date. *See* § 171(b)(1). And, in addition, § 171 requires that

(1) the amount of any bond premium shall be allocated among the interest payments on the bond under rules similar to the rules of subsection (b)(3), and (2) in lieu of any deduction under subsection (a), the amount of any premium so allocated to any interest payment shall be applied against (and operate to reduce) the amount of such interest payment.

§ 171(e).

The Glicks' argue that the "amount payable on maturity" of the CMO was the $362,000 principal and that the "basis" of the bond, at the time of purchase, was $12,260,730, leaving a "premium" of $11,898,730. *See* Pls.' Mem. Summ. J. Count II at 10.

Characterizing the CMO as a debt instrument with an $11,000,000 "premium," however, distorts the reality of the transaction. It is abundantly clear that the Code is not to be interpreted and applied to elevate form over substance. *See Cottage Sav. Ass'n v. Commissioner of Internal Revenue*, 499 U.S. 554, 111 S.Ct. 1519, 1520, 113 L.Ed.2d 589 (1991) (Blackmun, J. concurring in part and dissenting in part) (citing *Commissioner of Internal Revenue*

*v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945)); *Gregory v. Helvering*, 293 U.S. 465, 469–70, 55 S.Ct. 266, 79 L.Ed. 596 (1935). The reality of this transaction is that the CMO was *not* a debt instrument purchased at a premium. We conclude, therefore, that the rules stated in § 171 are clearly inapplicable. But rejecting § 171's applicability does not yet take us all the way home; we must still determine how the relevant Code provisions apply to calculate the Glicks' tax obligation on the CMO investment.

### 2. Relevant Tax Code Provisions

The Tax Reform Act of 1986 ("Act") created the REMIC as an investment tool and enacted provisions to deal specifically with their tax treatment. *See* 26 U.S.C. §§ 860A–860G; H.R. Conf. Rep. No. 99–841, *reprinted in* A COMPLETE GUIDE TO THE TAX REFORM ACT OF 1986 ("GUIDE"), at 4128 (Prentice Hall, 1986). A REMIC may contain only "regular interests" or "residual interests." § 860D(a)(2).[23] Section 860A provides that "[t]he income of any REMIC shall be taxable to the holders of interests in such REMIC as provided in this part." § 860A(b). With respect to the taxation of holders of regular interests in REMICs, the Act specified that "such interests ... shall be considered a debt instrument." § 860B(a). Moreover, the

[g]ain on the disposition of a regular interest shall be treated as ordinary income to the extent such gain does not exceed the excess (if any) of—

(1) the amount which would have been includible in the gross income of the taxpayer with respect to such interest if the yield on such interest were 110 percent of the applicable Federal rate (as defined in section 1274(d) without regard to paragraph (2) thereof) as of the

---

**23.** The parties agree that the investment involved in this case qualifies as a "regular interest" as defined at the time of the transac-

tion. *See* United States' Mem. Summ. J. Count II at 9 n. 6; Pls.' Mem. Summ. J. Count II at 17.

beginning of the taxpayer's holding period, over

(2) the amount actually includible in gross income with respect to such interest by the taxpayer.

§ 860B(c). Section 860B also specifically cross-references 26 U.S.C. § 1272(a)(6) "[f]or special rules in determining the inclusion of original issue discount on regular interests ...." § 860B(d).

Sections 1272 and 1273 deal with debt instruments issued with original issue discount. *See* 26 U.S.C. §§ 1272, 1273. Section 1273 provides the method for determining the amount of original issue discount. *See* § 1273. " '[O]riginal issue discount' means the excess (if any) of— (A) the stated redemption price at maturity, over (B) the issue price. § 1273(a)." The "stated redemption price at maturity" is defined as the amount "fixed by the last modification of the purchase agreement and includes interest and other amounts payable at that time (other than any interest based on a fixed rate, and payable unconditionally at fixed periodic intervals of 1 year or less during the entire term of the debt instrument)." § 1273(a)(2).[24] The "issue price," as related to this case, is the "initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such debt instruments was sold." § 1273(b)(1).

Section 1272 also requires that a taxpayer who holds a debt instrument having original issue discount shall include in his or her gross income "an amount equal to the sum of the daily portions of the original issue discount for each day during the taxable year on which such holder held such debt instrument." § 1272(a)(1). Section 1272 has special rules that apply to determine the "daily portions" of OID when the debt instrument is a "regular interest in a REMIC." § 1272(a)(6)(C)(i). For these interests,

(A) ... the daily portion of the original issue discount shall be determined by allocating to each day in any accrual period its ratable portion of the excess (if any) of—

(i) the sum of (I) the present value determined under subparagraph (B) of all remaining payments under the debt instrument as of the close of such period, and (II) the payments during the accrual period of amounts included in the stated redemption price of the debt instrument, over

(ii) the adjusted issue price of such debt instrument at the beginning of such period.

(B) Determination of present value— ... the present value shall be determined on the basis of—

(i) the original yield to maturity (determined on the basis of compounding at the close of each accrual period and properly adjusted for the length of the accrual period),

(ii) events which have occurred before the close of the accrual period, and

(iii) a prepayment assumption determined in the manner prescribed by regulations.

§ 1272(a)(6)(A), (B). Finally, by its express terms, § 1272 does not apply to a taxpayer "who has purchased the debt instrument at a premium, ...." § 1272(c)(1).

As noted above, § 1272 is specifically cross-referenced in § 860B(d). The conference committee report clarifies that Congress intended that "[t]he OID rules provided by the conference agreement also apply to OID on qualified mortgages held by a REMIC." H.R. Conf. Rep. No. 99–841, *reprinted in* GUIDE at 4136. For purposes of security interests such as REMICs, the conferees intended that "the regulations will provide that the prepayment assumption to be used in calculating [OID under § 1272(a)(6) ] will be that used

---

**24.** Although not clearly applicable to the present transaction, the regulations define the stated redemption price at maturity as the "sum of all payments provided by the debt instrument other than qualified stated interest payments." 26 C.F.R. § 1.1273–1(b).

by the parties in pricing the particular transaction," *id.*, and that "[i]n computing the accrual of OID ... on qualified mortgages held by the REMIC, only assumptions about the rate of prepayments on such mortgages would be taken into account." *Id.* at 4135 n. 22. The committee also specifically recognized that "the use of a prepayment assumption based on a recognized industry standard would be permitted ... [such as the] prepayment assumptions based on a Public Securities Association standard . . . ." *Id.* Finally, the committee identified the impact and tax consequences that OID would have, stating:

> [I]n no circumstances would the method of accruing OID [laid out in § 1272] allow for negative amounts of OID to be attributed to any accrual period. If the use of the present value computations [stated in § 1272] produce [sic] such a result for an accrual period, the conferees intend that the amount of OID attributable to such accrual period would be treated as zero, and the computation of OID for the following accrual period would be made as if such following accrual period and the preceding accrual period were a single accrual period.

*Id.*

These committee comments clearly indicate that § 1272's rules concerning OID apply to REMICs taxed under §§ 860A–860G. The committee also clearly intended that in computing the amount of OID, PSA assumptions were an appropriate tool for calculating the value of a REMIC. However, to provide certainty to the calculation, the PSA used should be that *actually* used by the parties to price the transaction.

These conclusions are augmented by the regulations promulgated pursuant to the Secretary of the Treasury's authority granted by § 860G(c),[25] which regulations unequivocally state that—

> [i]n determining the tax under chapter 1 of the Internal Revenue Code, a REMIC regular interest (as defined in section 860G(a)(1)) is treated as a debt instrument that is an obligation of the REMIC. Thus, sections 1271 through 1288, relating to bonds and other debt instruments, apply to a regular interest. For special rules relating to the accrual of original issue discount on regular interests, see section 1272(a)(6).

26 C.F.R. § 1.860G–1(b)(6). Although the applicability of these regulations relative to the instant transaction is unclear, the Secretary's directive certainly supports our conclusion that § 1272(a)(6)'s rule on OID applies to regular interests in REMICs.

The Glicks do not dispute that § 1272's OID rules apply in a general fashion to regular interests, but claim that, despite this general applicability, they are still inapplicable to *this* CMO purchase. The Glicks contend that when Congress enacted the Act, and the conference committee made the comments highlighted *supra*, § 860G(a) defined regular interests in a way that excluded security interests, such as the CMO, that "bore an interest rate that was 'disproportionally high' compared with its principal amount." Pls.' Mem. Summ. J. Count II at 17 (quoting H.R. Conf. Rep. No. 99–841, *reprinted in* GUIDE at 4130). Section 860G's definition of "regular interests" was amended two-years later to include "high-coupon instruments such as the CMO." Pls.' Mem. Summ. J. Count II at 17. Thus, the Glicks conclude that premium debt instruments such as the CMO were not initially intended to fall within the scope of the OID rules found in § 1272(a)(6). *Id.* at 18. The United States argues to the contrary and both parties invoke Congress' silence re-

---

**25.** These regulations only apply, by their own terms, to "a qualified entity ... whose startup day ... is on or after November 12, 1991." 26 C.F.R. § 1.860A–1(a). As noted elsewhere, we are unsure whether these regulations are directly applicable to this dispute, as neither party has briefed the issue; we nonetheless look to these regulations as guidance for how the IRS intended to treat regular interests in REMICs for federal tax purposes.

garding how to treat regular interests in REMICs with negative OID at the time it expanded the definition of "regular interests." *See id.;* United States' Mem. Summ. J. Count II at 12.

Interpreting congressional silence in the face of an amendment to another code provision is always a risky undertaking. There are a multitude of reasons which could lead Congress to amend one code section while leaving another alone, ranging from mere oversight, to a lack of consensus as to the proper course to take with the unaltered part, to a desire to have the unaltered section apply to the new section as amended, to a desire to no longer have the unaltered section apply to the altered section. Congressional silence is just that: silent. When it comes in response to an already existing statutory scheme, any conclusions drawn from that silence are speculative. However, we find persuasive the United States' reasoning in support of their position that Congress intended the OID scheme to continue to apply to regular interests as amended.

The United States maintains that the purpose behind prohibiting the recognition of negative OID prior to disposition of an asset was that "negative OID created in any accrual period due to market fluctuations, likely would be recouped in later periods or at least at maturity of the instrument." United States' Mem. Summ. J. Count II at 12. It is true that, in the case at bar, the parties have agreed that once the CMO's PSA exceeded 396% for as little as a single month, the Glicks would not be able to fully recoup their initial investment and that the CMO's PSA did in fact reach as high as 899% in 1993. *See* CMO Facts ¶ 18. Thus, the Glicks were not likely to be able to fully recoup their investment.

However, as the United States points out, the prohibition on negative OID still has force because later reductions in the CMO's PSA would have certainly led to the Glicks ultimately realizing a reduction in the CMO's value not nearly as large as the amount as they claimed on their 1993 tax forms. *See* United States' Mem. Summ. J. Count II at 13. This, we believe, is the very reason that Congress sought to prohibit accounting for negative OID and to assure that the final amount of OID claimed by the taxpayer would accurately reflect the final value of OID for the investment.[26]

### 3. Application of the Code Provisions to the CMO Investment

As noted previously, the parties agree that the CMO is a "regular interest" in a REMIC. *See* United States' Mem. Summ. J. Count II at 9 n. 6; Pls.' Mem. Summ. J. Count II at 17; § 860G(a)(1). Therefore, the Glicks' tax is calculated using § 860B, which specifically references § 1272(a)(6) and its rules regarding calculation of OID. *See* §§ 860A(b), 860B(d).

As defined by § 1273, the CMO's issue price was $12,260,730. *See* § 1273(b)(1); CMO Facts ¶ 4 ("The purchase price of the CMO was $12,260,730."). Section 1273 defines the CMO's stated redemption price at maturity as the amounts payable to the Glicks at the time of the purchase, pursuant to the purchase contract, excluding any interest payable that is based on a fixed rate. *See* § 1273(a)(2). The United States argues that none of the payments to be made on the CMO qualified as excludable interest; the Glicks argue that all of the payments made to the Glicks were excludable based upon a fixed interest rate of

---

**26.** The Glicks also argue that § 1272 applies only to inclusions in gross income and not to losses. *See* Pls.' Mem. Summ. J. Count II at 16. However, this argument presupposes that the CMO was purchased at a premium and therefore the Glicks could calculate the loss attributable to the CMO using § 171. *See id.* We have already determined that the CMO cannot properly be construed to be a debt instrument purchased at a premium and that § 171 does not apply to allow the Glicks to amortize that "premium." Therefore, having provided us with no alternative method to calculate the tax and no persuasive reasoning that § 1272 applies only to inclusions to gross income rather than losses, we will assume that § 1272 applies to losses and to gross income.

1006%. *See* United States' Mem. Summ. J. Count II at 14–15; Pls.' Reply Mem. Summ. J. Count II at 17–19.

Having previously rejected the argument that the CMO was an investment paying an interest rate of 1006%, we accept the United States' contention that none of the payments the Glicks were to receive constitutes "excludable" interest payments. *Cf.* Richard S. Millerick, Federal Income Tax Aspects of Stripped Mortgage–Backed Securities, Va. Tax. Rev. 219, 252 (1992) (concluding that the stated redemption price at maturity for traditional REMIC investment tools equals the total of all payments to be made to the investor because none of the payments to the investor qualify as excludable interest since "the investor is simply entitled to a stated share of the principal or interest payments on the underlying mortgages."). Therefore, the stated redemption price at maturity for the CMO was $14,350,615.24. *See* CMO Facts ¶ 12. Subtracting the issue price of $12,260,730 from the stated redemption price at maturity of $14,350,614 results in an OID of $2,097,885.

The Glicks have conceded that if we apply § 1272 and construe the CMO as a $14,000,000 debt instrument, issued with an OID of approximately $2,000,000, and with an interest rate of less than 8%, then "Defendant is entitled to summary judgment." Pls. Reply Mem. Summ. J. Count II at 2. This is precisely the conclusion we reach. Since the final payments on the CMO came in 1994, the Code treats it as not sold or exchanged until then. *See* 26 U.S.C. § 1271(a)(1); CMO Facts ¶ 24. Therefore, the Glicks could not recognize the loss from the CMO until 1994. The United States' motion for summary judgment is therefore *GRANTED* and the Glicks' motion for summary judgment is *DENIED.*[27]

---

**27.** The Glicks have also moved to strike Footnote 1 of the United States' reply memorandum. This footnote argues that, should we find in favor of the Glicks as to Count II, the Glicks are still not entitled to any recovery due to the status of an arbitration action involving the Glicks and Bear Stearns, the

*IV. Conclusion*

For the reasons discussed above, we *GRANT* the Glicks' motion for summary judgment on Count I and *DENY* the United States' motion for summary judgment on Count I. Judgment will enter in favor of the Glicks on Count I and damages awarded to Plaintiffs in the amount of $1,823,865. In addition, we *GRANT* the United States motion for summary judgment on Count II and *DENY* the Glicks' motion for summary judgment on Count II. Judgment will be entered in favor of the United States on Count II.

investment brokerage who suggested that Mount Vernon purchase the CMO. *See* United States' Reply Mem. Summ. J. Count II at 2 n. 1. In light of our resolution of Count II in favor of the United States, the Glicks' motion to strike is *DENIED AS MOOT.*